# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Ronald A. Guzman | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 01 C 2674 | **DATE** | 3/28/2002 |
| **CASE TITLE** | CHRISTOPHER VARTANIAN vs. METROPOLITAN LIFE INSURANCE COMPANY | | |

**MOTION:**

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ General Rule 21 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Plaintiff's motion for summary judgment [8-1] is granted. Defendant's cross-motion for summary judgment [15-1] is denied. Enter Memorandum Opinion. Status hearing set for 4/17/02 at 9:30 a.m.

(11) ■ [For further detail see order attached to the original minute order.]

| | No notices required, advised in open court. | | | | | **Document Number** |
|---|---|---|---|---|---|---|
| | No notices required. | | | number of notices | | |
| | Notices mailed by judge's staff. | | | | | |
| | Notified counsel by telephone. | | | MAR 2 9 2002 | | |
| ✓ | Docketing to mail notices. | | | date docketed | | 22 |
| | Mail AO 450 form. | | | docketing deputy initials | | |
| | Copy to judge/magistrate judge. | | | | | |
| CG | | courtroom deputy's initials | | date mailed notice | | |
| | | | Date/time received in central Clerk's Office | mailing deputy initials | | |

DOCKETED

MAR 2 9 2002

CHRISTOPHER VARTANIAN, )
)
)
Plaintiff, )
)
v. ) Case No. 01 C 2674
)
)
METROPOLITAN LIFE INSURANCE ) Judge Guzman
COMPANY, and CHICAGO SUN-TIMES )
LONG TERM DISABILITY INSURANCE )
PLAN, )
)
Defendants. )

## MEMORANDUM OPINION

Pending are cross motions for summary judgment pursuant to Fed. R. Civ. P. 56. For the reasons set forth below Plaintiff's motion is granted and Defendant's motion denied.

## BACKGROUND

Christopher Vartanian ("Mr. Vartanian") was a full-time employee for Defendant the Chicago Sun-Times ("Sun-Times") from 1982 until July 19, 1993. Compl. and Ans., ¶8. The Sun-Times established and maintained a long-term disability ("LTD") plan (the "Plan") for its eligible employees, including Mr. Vartanian, to provide them with LTD coverage. Compl. and Ans., ¶7. Mr. Vartanian was a "participant" in the plan. MET 0530-0056. The Plan was insured by MetLife, which also acted as claims administrator for the Plan. MET 0553-0554. The Plan is an "employee welfare benefit plan" as defined by ERISA §102(1), 29 U.S.C. §1002(1). Compl. and Ans. ¶7. LTD benefits commence 183 days after the onset of disability. MET 0534. LTD benefits are payable for "total disability," which is defined in relevant part as follows:

1

Total Disability and Totally Disabled means that, due to an injury or
sickness, you:

    a.  are completely and continuously unable to perform each of the material
           duties or your regular job; and
    b.  require the attendance of a Doctor.

However, after the first 24 months of benefit payments, you must also be
completely and continuously unable to perform the duties of any gainful work or
service for which you are reasonably qualified taking into consideration your
training, education, experience and past earnings. MET 0541.

The Plan gives the plan administrator and plan fiduciaries discretionary authority
to "determine eligibility for and entitlement to plan benefits." MET 0556. The Sun-
Times is identified as a plan administrator. MET 0553. MetLife is not identified as a
plan fiduciary, though it is undisputed that they made all of the decisions regarding Mr.
Vartanian's benefits. MET 0553. The Plan indicated that the people who operated the
plan were "fiduciaries". MET 0555. The Plan gives the Plan Administrator and other
Plan fiduciaries "discretionary authority to interpret the terms of this Plan and to
determine eligibility for and entitlement to Plan benefits in accordance with the terms of
the Plan." MET 0556. In the instance where a claim has been denied, the Plan provides a
mechanism where the employee can request a review by MetLife. MET 0556.

In 1993, Mr. Vartanian had to stop working due to chronic fatigue syndrome
("CFS"), and in 1994, Mr. Vartanian applied to MetLife for LTD benefits under the Plan.
MET 0428-0433. Mr. Vartanian submitted medical records to support his claim alleging
CFS, including an attending physician certification completed by his treating doctor,
Daniel Derman, M.D., supplemented by reports form other doctors, including Daniel
Bell, M.D., Morris Papernik, M.D., and Robert Reff, M.D.. MET 0432-0433. Initially,
MetLife was suspicious of Mr. Vartanian's claim (MET 0380), but benefits were
approved for Mr. Vartanian with benefits commencing around January 19, 1994. MET

2

0332-0333.

Mr. Vartanian also pursued a Social Security disability insurance claim, which was approved by an Administrative Law Judge on August 2, 1996. MET 0362. The Administrative Law Judge found Mr. Vartanian incapable of engaging in his past work. MET 0085–0087. As a result of the Social Security Award, MetLife recouped $17,650.83 in benefits previously paid to Mr. Vartanian. MET 0055-0057. Also, the monthly benefits paid to Mr. Vartanian by MetLife were reduced by the Social Security payments. MET 0063. After the grant of Social Security disability insurance, MetLife considered a lump sum settlement to Mr. Vartanian, but Frank Georgell, a MetLife supervisor, refused to make a settlement offer, stating, in reference to the Mr. Vartanian, "I don't think "CFS" is a good settlement candidate. ... He lives on Lake Shore Drive, presumably in a very nice/upscale apt/neighborhood. I don't see what he would do with the money. He's only 40 y.o. and has a long time ahead of him. A lot can happen in 25 years to change his condition!" MET 0048.

Mr. Vartanian continued to suffer from his condition, and he continued to report ongoing disability to MetLife. MET 0102-9; 0116-28; 0146-50. The evidence proved satisfactory to MetLife which documented that Mr. Vartanian satisfied the Centers for Disease Control criteria for CFS. MET 0144. In addition, MetLife put Mr. Vartanian under surveillance which showed no significant activity. MET 1103-6. Ongoing medical reports indicated that Mr. Vartanian remained disabled and was not a candidate for rehabilitation. MET 1086-89; 1091-2. In October of 1998 Mr. Vartanian required open heart surgery to repair a mitral valve. MET 1052-1071. Following surgery, Mr. Vartanian's condition did not improve, and treating physician, Steven Korotkin, M.D., reported that Mr. Vartanian could sit no longer than 4 hours per day. MET 0987-91; 0939.

3

During the period Mr. Vartanian received benefits from MetLife, Mr. Vartanian submitted medical records and reports. In December 1998 and October 1999, MetLife conducted interviews with the Mr. Vartanian. MET 0807. After the October 1999 interview, MetLife received more medical records form Mr. Vartanian's treating physicians, Drs. Steven Korotkin and Lawrence Mendelsohn. MET 0807. Around January 31, 2000, MetLife forwarded all of Mr. Vartanian's medical records and information to an independent medical consultant, Mark A. Moyer for review. MET 0915. Dr. Moyer is a physician with Network Medical Review. Dr. Moyer is board certified in both internal medicine and infectious diseases. MET 0819. Dr. Moyer reviewed records from at least 9 physicians as well as numerous reports and test and lab results. MET 0814-15. Dr. Moyer determined that Mr. Vartanian no longer met the criteria for a diagnosis of CFS. MET 0909-14. Mr. Vartanian's physician, Dr. Korotkin responded that Mr. Vartanian was experiencing a "honeymoon" form CFS. MET 0891. In March, 2000, Mr. Vartanian's cardiologist reported that Mr. Vartanian was experiencing trouble with his repaired heart valve. MET 0825.

In March 2000, MetLife decided to terminate Mr. Vartanian's benefits. MET 0810. This decision was communicated to Mr. Vartanian on March 29, 2000. MET 0806-9. This decision was based on Dr. Moyer's review of Mr. Vartanian's file determining that Mr. Vartanian could return to "a light to medium work level position". Prior to this decision, MetLife identified three occupations which Mr. Vartanian would be capable of performing with his training, experience and education, and that were available in his geographic area. MET 0637; 0808.

On May 11, 2000 Mr. Vartanian submitted a formal appeal to MetLife's decision to terminate his benefits. MET 0789. Mr. Vartanian submitted medical records and reports documenting his continued cardiac impairment and his need for a second open heart surgery. MET 0752-767. Included in the medical reports was a letter dated June

28, 2000, from Dr. Charanjit Rihal, stating: "Please note that Mr. Christopher Vartanian is a patient under my car at the Mayo Clinic. This note is to certify that he is fully disabled from a cardiac standpoint because of mitral valve disease. He is currently waiting repeat mitral valve surgery. There will be a period of time following surgery during which he also will not be able to work to allow for recovery ...." MET 0751. Also included was a letter dated April 19, 2000, from Mr. Vartanian's physician, Dr. Korotkin, stating that Mr. Vartanian was still feeling ill due to his CFS. A report from Dr. Mendelsohn was even more restrictive than Dr. Korotkin's report.

MetLife submitted all previous medical records and all subsequent medical records to two separate physicians for their review: Dr. Moyer, who had previously reviewed Mr. Vartanian's records, and Dr. Parag Patel, Board Certified in Internal Medicine and Cardiology. MET 0665-669; 0710-714. Dr. Moyer noted that some of Mr. Vartanian's tests were consistent with CFS, but not confirming and not a measure of his work ability. MET 0701. Dr. Moyer also determined that as of April 2000, Mr. Vartanian was capable of only sedentary work, but that after his August 4, 2000 surgery and cardiac rehabilitation, Mr. Vartanian would be able to return to work. MET 0701. Dr Patel noted that the primary diagnosis affecting Mr. Vartanian's ability to work is the mitral valve stenosis/regurgitation. MET 0664-69. A secondary diagnosis to consider is the CFS. MET 0664-69. Dr. Patel determined that Mr. Vartanian had only a mild impairment in cardiac function before the August 4, 2000 surgery, and could achieve maximum medical improvement after cardiac rehabilitation. MET 0664-69.

On December 26, 2000, MetLife upheld its decision to terminate Mr. Vartanian's benefits. MET 0634-41. On December 28, 2000, Mr. Vartanian's attorneys requested that MetLife hold Mr. Vartanian's claim open until January 31, 2001. MET 0619. MetLife agreed to review any information submitted by January 31, 2001. MET 0618. Mr. Vartanian submitted information showing that his cardiac rehabilitation started on

December 18, 2000 and was expected to continue for six weeks. MET 0616. Further, Mr. Vartanian submitted a report from Dr. David Bell supporting Mr. Vartanian's ongoing CFS. MET 0613-15. Finally, Mr. Vartanian submitted a report of functional capacity testing on March 1, 2001, stating that Mr. Vartanian was unable to return to full time employment in any occupation at this time. MET 0559-611.

MetLife reviewed the information sent by Mr. Vartanian through March 2001. MET 557-558. MetLife stated that none of the additional submissions supported a conclusion that Mr. Vartanian was disabled at the time of termination of Mr. Vartanian's benefits. Accordingly, MetLife stood by its two prior decisions to terminate Mr. Vartanian's benefits.

## DISCUSSION

Summary judgment is appropriate if the pleadings, answers to interrogatories, admission, affidavits and other materials show that "there is no genuine issue as to any material facts and the moving party is entitled to judgment as a matter of law." Fed. R.Civ. 56(b). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Libery Lobby, Inc.,* 477 U.S. 242, 248, 106 S. Ct. 2505, 2510, 91 L. Ed. 2d 202 (1986). The party seeking summary judgment carries the initial burden of showing that no such issue of material fact exists. Pursuant to Rule 56(b), when a properly supported motion for summary judgment is made, the adverse party must set forth specidific facts showing that there is a genuine issue of material facts and that the moving party is not entitled to judgment as a matter of law. *See Anderson,* 477 U.S. at 250.

In making our determination, we are to draw inferences from the record in a light most favorable to the non-moving party. We are not required to draw every conceivable inference, but only those that are reasonable. *See DeValk Lincoln Mercury, Inc. v. Ford*

*Motor Co.,* 811 F. 2d 326, 329 (7th Cir. 1987)). The nonmovant may not rest upon mere allegations in the pleadings or upon conclusory statements in affidavits; rather, the party must go beyond the pleadings and support his contentions with proper documentary evidence. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 324, 106 S. Ct. 2548, 2553, 91 L. Ed. 2d 265 (1986). Rule 56 mandates the entry of summary judgment agaisnt a party who fails to establish the existence of an element essential to that party's cause of action. *See Celotex,* 477 U.S. at 422.

For cross-motions for summary judgment, each movant must individually fulfill the stringent requirement to obtain summary judgment under Rule 56, such standards still being applicable. *United v. Ill. Central R.R.,* 998 F. Supp. 874, 880 (N.D. Ill. 1998). By filing cross-motions for summary judgment the parties do not waive trial, unless the judge disagrees. *Miller v. LeSea Broadcasting, Inc.,* 87 F. 3d 224, 230 (7th Cir. 1996). Indeed upon cross motions for summary judgment, the court is not required to grant summary judgment as a matter of law for either side. *Brownless v. City of Chicago,* 983 F. Supp. 776, 779 (N.D. Ill. 1997). Rather, the court will evaluate each motion on its merits, resolving factual uncertainities and drawing all reasonable inferences against the movant. *Brownlee,* 983 F. Supp. at 779. With these principles in mind, we turn to the merits of the motions.

This case arises under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §1132(a)(1)(B), which grants an individual the right to bring an action under ERISA in federal court. The issues presented in this case are: 1) whether MetLife is a fiduciary under the Plan and whether MetLife is granted discretion under the terms of the Plan; 2) whether the proper standard of review is *de novo* or the more differential arbitrary and capricious standard; and 3) whether MetLife breached its duty to Mr. Vartanian under the applicable standard. To determine the appropriate standard of review, we must first determine whether, under the plan, MetLife was a "fiduciary" and

whether the Plan granted MetLife discretion over Mr. Vartanian's claim.

## I.

The first issue that must be addressed is whether MetLife was a Plan fiduciary as set forth in the Chicago Sun-Times ERISA. To determine whether MetLife is a "fiduciary" under the Plan, this court looks to the plain language of the Plan and reviews the language *de novo. See Ramsey v. Hercules Incorporated*, 77 F.3d 199, 205 (1996). The Plan states that:

> The people who operate your Plan, called "fiduciaries" of the Plan, have a duty to do so prudently and in the interest of you and other participants and eligible survivors.
>
> MET 0555.

Further, ERISA defines the term "fiduciary" in 29 U.S.C. §1002(21)(A), which reads, in part:

> Except as otherwise provided in subparagraph (B), a person is a fiduciary with respect to a plan to the extent (i) he exercises any discretionary authority or discretionary control respecting management of plan assets... or (iii) he has any discretionary authority or discretionary responsibility in the administration of such a plan.

Mr. Vartanian argues that MetLife cannot be a Plan fiduciary because MetLife is not a named fiduciary. It seems clear that the Plan defines fiduciaries as those who "operate" the plan. So, if MetLife is determined to "operate" the plan, then MetLife would be a fiduciary. This circuit has defined fiduciary broadly. "It is clear that Congress intended the definition of fiduciary under ERISA to be broad." *Chicago Board Options Exchange, Inc. v. Connecticut General Life Insurance Company*, 713 F.2d 254, 260 (7th Cir. 1983). Further, a person is a fiduciary if that person exercises "any power of control, management or disposition with respect to monies or other property of an

8

employee benefit fund, or had the authority or responsibility to do so." *Forys v. United Food & Commercial Workers Int'l Union, AFL-CIO, & CLC*, 829 F.2d 603, 607 (quoting H.R.Rep. No. 533, 93[d] Cong., 2d Sess. 11, *reprinted in* 1974 U.S.Code Cong. & Admin. News 4639, 4649).

Both parties acknowledge that MetLife made all of the decisions regarding the long term disability benefits bestowed upon Mr. Vartanian. Plaintiff Brief at 6; Defendant Brief at 10. Further, all of the communications regarding Mr. Vartanian's disability and all of the determinations made regarding Mr. Vartanian's case were made by MetLife. Mr. Vartanian argues that MetLife is not a fiduciary because there is no express grant of discretion to MetLife. However, the designation of fiduciary in the Plan as all those who operate the Plan seems to clearly make MetLife a fiduciary. The record clearly indicates that MetLife did indeed work to operate the plan, and, as such, It was a fiduciary.

## II.

Having determined that MetLife was a fiduciary, we turn to the applicable standard of review to apply to MetLife's decision. The Supreme Court discussed the appropriate standard of review applicable to ERISA claims since ERISA is silent on the standard to be applied. *See Firestone Tire and Rubber Company v. Bruch*, 489 U.S. 101, 115, 109 S.Ct. 948, 956-57 (1989). The Supreme Court determined that the default standard of review in ERISA cases is de novo. *Id*. However, the Court noted that the arbitrary and capricious standard was appropriate in certain circumstances. "[A] denial of benefits challenged under §1132(a)(1)(B) is to be reviewed under a de novo standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Id*. The Supreme

9

Court stated that the appropriate standard of review when the Plan confers discretionary power on a plan administrator or fiduciary is the deferential standard of arbitrary and capricious. *Id.* at 111, 109 S.Ct. at 954. Following this standard set out by the Supreme Court, this circuit laid out a test to be employed in determining if an administrator or plan fiduciary was granted sufficient discretion in the Plan at issue.

This circuit provided for safe harbor language that would defeat the presumption for de novo review. "Benefits under this plan will be paid only if the plan administrator decides in his discretion that the applicant is entitled to them." *Herzberger v. Standard Insurance Company*, 205 F.3d 327, 331 (7th Cir. 2000). The safe harbor language was not made mandatory, but rather gives a guide as to how clear the grant of discretion must be to overcome the default *de novo* review. The test for determining whether a plan administrator or other fiduciary has discretion is if the Plan contains language that "indicates with the requisite if minimum clarity that a discretionary determination is envisaged." *Id.*

In this case, the Plan reads:

> In carrying out their respective responsibilities under the Plan, the Plan administrator and other Plan fiduciaries shall have discretionary authority to interpret the terms of This Plan and to determine eligibility for and entitlement to Plan benefits in accordance with the terms of the Plan. Any interpretation or determination made pursuant to such discretionary authority shall be given full force and effect, unless it can be shown that the interpretation or determination was arbitrary and capricious.

MET 0556.

The court concludes that this language grants the Plan administrators discretion which the court reviews under the deferential arbitrary and capricious standard. See *James v. General Motors Corp.*, 230 F. 3d 315, 317 (7th Cir. 2000). Under this standard any questions of judgment are left to the Plan administrator. *Patterson v. Caterpiller, Inc.*, 70 F. 3d 503, 505 (7th Cir. 1995). MetLife made its decision to terminate Mr. Vartanian's benefits using the discretion that is

explicitly granted to it by the Plan. It is hard to imagine wording any clearer than that contained in this Plan to give notice that the Plan administrators and fiduciaries will have discretion and further will be subject to and arbitrary and capricious standard of review. Accordingly, we hold that the Plan did confer discretion on MetLife sufficient to review MetLife's actions under the arbitrary and capricious standard of review.

### III.

Mr. Vartanian next contends that even if the plain language of the plan confers upon MetLife discretion, they should still be subject to a *de novo* standard of review because of the inherent conflict of interest present in MetLife's actions. The Supreme Court acknowledged that if "a benefit plan gives discretion to an administrator or fiduciary that is operating under a conflict of interest, that conflict must be weighed as a 'facto[r] in determining whether there is an abuse of discretion.'" *Firestone*, 489 U.S. at 115, 109 S.Ct. at 957 (*citing* Restatement (Second) of Trusts § 187, Comment d (1959)). It is important to note that even if MetLife is acting under a conflict of interest, this does not change the standard of review from arbitrary and capricious to *de novo*, it merely causes the court to give the arbitrary and capricious standard "more bite". *Chojnacki v. Georgia-Pacific Corp.*, 108 F.3d 810, 815 (7th Cir. 1997). Mr. Vartanian contends that MetLife's position as both payor of claims and adjudicator of claim eligibility is a sufficient conflict of interest to eliminate any level of deference owed to MetLife's decision. Plaintiff Brief at 7.

The law in this circuit is relatively clear. The presumption is that "a fiduciary is acting neutrally unless a claimant shows by providing specific evidence of actual bias that there is a significant conflict." *Mers v. Marriott Internat'l Group Accidental Death and Dismemberment Plan*, 144 F.3d 1014, 1020 (7th Cir. 1998). The court in *Mers* rejected the theory that a significant conflict exists merely because there is an inherent conflict.

*Id.* This determination was based on a law-and-economics rationale that determined that an insurance company's granting or denial of one claim was "not sufficiently substantial to threaten an administrator's impartiality." *Id.* Further, the court determined that it would be poor business for an insurance company to resist paying meritorious claims because the companies that hire them want their employees to be satisfied with their fringe benefits, so if an insurance company regularly denied valid claims, a company would be likely to go elsewhere. *Id.* at 1021. With this in mind, the court in *Mers* rejected the notion that an insurance company which was responsible for interpreting the plan had an inherent conflict of interest. *Id.* at 1020. Relying on the decision in *Mers*, a person must show actual evidence of bias or conflict above a theory of inherent conflict. *Id.* Mr. Vartanian argues here that we should follow the Third Circuits reasoning in *Pinto v. Reliance Standard Life Insur. Co.*, which disagreed with this circuits reasoning in *Mers*. 214 F.3d 377, 388 (3d Cir. 2000). The Third Circuit in *Pinto* argued that in ERISA litigation, the matter at issue is often a close call, and insurance companies would have "an active incentive to deny close claims in order to keep costs down." *Id.* This is not the view that has been adopted in this circuit. So, having determined Mr. Vartanian must show proof of actual bias or conflict to succeed in the argument that there is a conflict of interest that would require a more plenary review, we turn to Mr. Vartanian's evidence.

Mr. Vartanian argues that there is a conflict of interest based on MetLife's bias toward Mr. Vartanian's condition based on a note written by a MetLife claim supervisor and subsequent actions by MetLife. However, we find this evidence insufficient to establish proof of actual bias or conflict of interest.

The alleged bias comment " I don't think "CFS" is a good settlement candidate. .... He lives on Lake Shore Drive, presumably in a very nice/upscale apt/neighborhood. I don't see what he would do with the money. He's only 40 y.o. and has a long time ahead

of him. A lot can happen" is insufficient to establish bias. This comment was written in response to a suggestion that MetLife settle the claim with a lump sum settlement. To be sure the comment is the kind of callous and insensitive language one would not expect to hear from a concerned and conscientious fiduciary. Even if the wording showed skepticism about Mr. Vartanian's condition, however, this is undermined by MetLife continuing to pay benefits to Mr. Vartanian for two and a half years after the note was written. Mr. Vartanian also relies on MetLife's subsequent behavior, such as placing Mr. Vartanian under surveillance. Without a showing that surveillance is not appropriate and as such demonstrates bias, this is not sufficient to infer bias. It is the responsibility of MetLife to ensure that they are not being defrauded and any measures they may take to verify a claim are probably reasonable unless it can be shown otherwise.

The second contention by Mr. Vartanian is that MetLife ignored Mr. Vartanian's second surgery and stopped payments in the face of Mr. Vartanian's worsening condition. Plaintiff's Brief at 8. Mr. Vartanian also argues that MetLife relying on reviewing physicians' conclusions over that of treating physicians shows a conflict. Mr. Vartanian also contends that MetLife stopping payments to Mr. Vartanian without any evidence of a change in Mr. Vartanian's condition. To show that these facts demonstrate a conflict of interest, Mr. Vartanian relies on *Regula v. Delta Family-Care Disability Survivorship Plan*, 2001 WL 1111616 *14 (9th Cir. 2001). The court in Regula found "inconsistency in the administrator's dealings with the beneficiary" to be evidence of self-interest, and the court also expressed concern over an insurer repeatedly hiring the same physicians as experts. *Id.* at *10, *14. The law in this circuit is fairly clear in requiring a "significant conflict". *Mers*, 144 F.3d at 1020. In this circuit there is a presumption against a conflict without specific evidence. *See id.*

MetLife's decision in this case was based on reviewing physicians' determinations that Mr. Vartanian was capable of a light to medium work level position and a

13

transferable skills analysis that identified three occupations that Mr. Vartanian could perform. Defendant's Brief at 5. Based on the wording of the Plan, a fiduciary must be "completely and continuously unable to perform the duties of any gainful work . . . ." MET 0541. Having found positions for which Mr. Vartanian was qualified for and able to perform based on two doctor's opinions, it is hard to say that MetLife was inconsistent in its dealings with Mr. Vartanian.

Mr. Vartanian also contends that MetLife showed prejudice by failing to credit Mr. Vartanian's reports of ongoing chronic fatigue syndrome. Plaintiff's Brief at 9. Mr. Vartanian relies on *Friedrich v Intel Corp.*, 181 F.3d 1105, 1110 (9th Cir. 1999) for the proposition that a benefit plan forfeits its discretion by denying the claimant the opportunity to prove disability. The facts in *Friedrich* are distinguishable from this case because there, the insurers failed to follow their own standards for a claim by denying the claimant a sufficient opportunity to prove his disability. In this case, there is no contention that MetLife did not follow proper procedures. In fact, MetLife allowed Mr. Vartanian to submit many records and evidence of his disability. MetLife's decision was based on reviewing doctor's conclusions from much of the evidence that Mr. Vartanian submitted and their determination that Mr. Vartanian was capable of performing at a moderate level. So, there is no conflict of interest here that can be supported by Mr. Vartanian's contentions.

Having determined that there is no evidence of bias sufficient to show a conflict of interest, there can be no reduction in the arbitrary and capricious standard of review that should be applied to MetLife's decision. So, the next question is whether MetLife's actions were unreasonable.

Having determined that there is no significant conflict of interest and the appropriate standard of review is the arbitrary and capricious standard, we must determine if MetLife's actions with regard to Mr. Vartanian's benefits breached that standard. Under the arbitrary and capricious standard, MetLife's decision "must be based on a reasonable interpretation of the relevant factual circumstances." *Russo v. Health, Welfare, & Pension Fund, Local 705, Int'l Bhd. Of Teamsters*, 984 F.2d 762, 766 (7th Cir. 1993). MetLife's decision will not stand if it has:

> relied on factors which Congress has not intended it to consider, entirely
> failed to consider an important aspect of the problem, offered an
> explanation for its decision that runs counter to the evidence before the
> agency, or is so implausible that it could not be ascribed to a difference in
> view or the product of agency expertise.

*Motor Vehicle Mfr's Ass'n. of the United States, Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983). Under the arbitrary and capricious standard of review, MetLife's decision may be set aside only if it was "downright unreasonable". *Chojnacki*, 108 F.3d at 816. In other words, a court must uphold a decision so long as that decision is based on a reasonable interpretation of the Plan's language and the evidence in the case. *Daill v. Sheet Metal Workers Local 73,* 100 F. 3d 62, 68 (7th Cir. 1996). "All questions of judgment are left to the Plan, and a court must be very confident that the Plan overlooked something important or seriously erred in appreciating the significance of the evidence to overturn the Plans determination." *Kuba v. Washington Nat'l Ins. Co.*, 2000 WL 1231554 at *4 (N.D.Ill. Aug. 28, 2000).

While it is undisputed that the committee investigated Vartanian's claim it is undisputed that the committee failed to consider critically important aspects of Mr. Vartanian's claim. The main problem with MetLife's decision in this case is that it was primarily based on reviewing doctors' opinions after an analysis of Mr. Vartanian's medical record. Chronic Fatigue

Syndrome is a complex disease with a variety of symptoms including "mild fever, sore throat, painful lymph nodes, mild headaches and forgetfulness." *Gawrysh v. CNA Insurance Co.*, 8 F.Supp.2d 791, 794 (N.D.Ill. 1998). Mr. Vartanian submitted numerous reports over the years by his various doctors confirming that he suffered chronic fatigue syndrome. Mr. Vartanian also successfully pursued a social security claim approved by an Administrative Law Judge on August 2, 1996. MetLife had two doctors review Mr. Vartanian's medical records. Both of these doctors were with Network Medical Review. MetLife continually uses doctors from Network Medical Review. *See Ladd v. ITT Corp.*, 148 F.3d 753, 755 (7th Cir. 1998). In *Ladd*, the Seventh Circuit determined that MetLife's decision to deny benefits was arbitrary and capricious. *Id.* The court based this on the facts that the Ladd's condition in that case was worse at the time of claim denial than it had been when the Social Security Administration had granted it, that no doctor who examined Ladd, including the doctor selected by MetLife, found her capable of work, and no reasons were given for disagreeing with the doctors' conclusions. *Id.* at 756.

In this case, all doctors who examined Mr. Vartanian agreed that he was not capable of work. MetLife had two doctors review Mr. Vartanian's records. One of the reviewing doctors, Dr. Moyer, stated that the evidence was consistent but not confirming of chronic fatigue syndrome. This finding does not rebut the examining doctors' diagnosis. MET 0710-14. Only Dr. Moyer further stated that Mr. Vartanian's physical test results were not consistent with chronic fatigue syndrome. The other doctor determined that Mr. Vartanian should be able to achieve medical improvement following cardiac rehabilitation after his second heart surgery. MET 0664-669. Dr. Moyer determined based on Mr. Vartanian's tests that Mr. Vartanian could return to a light to medium work level position. MET 0891. Mr. Vartanian subsequently submitted more doctors' reports confirming his diagnosis of chronic fatigue syndrome. MET 0613-15; 0559-611.

MetLife relied solely on reviewing doctors opinions over those of Mr. Vartanian's treating doctors. Were MetLife acting in good faith in terminating Mr. Vartanian's benefits, it

16

seems it should have hired an independent physician to actually examine Mr. Vartanian. Had this been done and properly documented, there would be no basis to overturn its decision. However, that is not the case. In addition, MetLife initially terminated Mr. Vartanian's benefits immediately before a second heart surgery that even the reviewing doctors said would incapacitate Mr. Vartanian for a period. We can determine no reasonable or rational basis for such an action. A reasonable decision maker, one not operating under a predisposition or inclination to terminate benefits, would have atleast deferred any action until the full results of Mr. Vartanian's cardiac rehabilitation were actually known. We discern not a reasonable and objective approach and decision making process, but rather a hurried determination to terminate benefits based upon the thinnest of evidence and a prediction as to the ultimate results of a second surgery and cardiac rehabilitation. Given the solid evidence and history of prior prolonged incapacity, this determination is not only erroneous, its downright unreasonable.

## CONCLUSION

For the reasons set forth above, Plaintiff's motion for summary judgment is granted. Defendant's cross-motion for summary judgment is denied.

**SO ORDERED**                    ENTERED: _Ronald A. Guzman_

                                            **Ronald A. Guzman**
                                            **United States Judge**
                                            3/28/02